UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

```
                                 )
In re:                           )
                                 )
COMBUSTION ENGINEERING, INC.     )      HONORABLE JOSEPH E. IRENAS
                                 )            CIVIL ACTION
           Debtor.               )         NO. 04-1550 (JEI)
                                 )      BANKRUPTCY NO. 03-10495(JKF)
                                 )      ADVERSARY PROC. NO. 03-53076
TIG INSURANCE COMPANY (solely    )
as successor by merger to        )
International Insurance          )
Company), and THE NORTH RIVER    )              OPINION
INSURANCE COMPANY,               )
                                 )
           Plaintiffs,           )
                                 )
      v.                         )
                                 )
COMBUSTION ENGINEERING, INC.,    )
and BASIC, INC.,                 )
                                 )
           Defendants.           )
                                 )
```

**Appearances:**

MARKS, O'NEILL, O'BRIAN AND COURTNEY, P.C.
BY: Brian L. Kasprzak, Esq.
913 North Market Street, Suite 800
Wilmington, Delaware  19801

CROWELL & MORING LLP
BY: Jonathan H. Pittman, Esq.
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

SIDLEY AUSTIN BROWN & WOOD LLP
BY: Carter Phillips, Esq.
1501 K Street
Washington, D.C.  20005

Counsel for Plaintiffs.

KIRKLAND & ELLIS LLP
BY: Lisa G. Esayian, Esq.
200 East Randolph Drive
Chicago, Illinois 60601-6636

          Counsel for Defendant Basic, Inc.

KIRKPATRICK & LOCKHART LLP
BY: Philip H. Hecht, Esq.
1800 Massachusetts Avenue, N.W.
Washington, D.C.  20036

          Counsel for Defendant Combustion Engineering, Inc.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WIENTRAUB P.C.
BY: Michael P. Migloire, Esq.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

          Counsel for Defendants Combustion Engineering,
          Inc., and Basic, Inc.

GILBERT HEINTZ & RANDOLPH LLP
BY: Jonathan M. Cohen, Esq.
1100 New York Avenue, N.W., Suite 700
Washington, D.C.  2005

          Counsel for Future Claimants.


**IRENAS**, Senior District Judge:[1]

     The instant interlocutory appeal arises from an adversary

proceeding associated with the Chapter 11 bankruptcy filing of

Combustion Engineering, Inc. ("CE").  *See In re Combustion*

---

     [1]By Order on December 8, 2004, Chief Judge Anthony J.
Scirica of the United States Court of the Appeals for the Third
Circuit designated and assigned Judge Irenas to sit on the United
States District Court for the District of Delaware in this
matter.

                              2

*Engineering, Inc.*, Dist. of Delaware Bankruptcy No. 00-10495.
Plaintiffs-Appellants TIG Insurance Company, as successor by
merger to International Insurance Company ("International"), and
the North River Insurance Company ("North River") (collectively
"Plaintiffs") are insurance companies that issued excess
liability policies to Defendants CE and its subsidiary Basic,
Incorporated ("Basic") (collectively "Defendants").  Plaintiffs
appeal the Bankruptcy Court's Order of July 20, 2004, Granting
Summary Judgment for Defendants on Counts I and II of Plaintiffs'
Complaint.  This Court holds that the Bankruptcy Court erred in
concluding that the language of the contract was unambiguous, but
affirms the grant of summary judgment for Defendants.

I.

Combustion Engineering ("CE"), a Delaware corporation,
previously manufactured and distributed steam boilers that have
been alleged to contain asbestos.  The first lawsuit brought
against the company for asbestos-related injuries was filed in
the 1960s.  In the 1970s, a few hundred asbestos-related injury
claims were brought against CE each year.  By 1990, 19,000 cases
were brought annually.  In 2002, the year before CE filed for
Chapter 11 bankruptcy, the company was named as a defendant in
79,000 lawsuits by individuals claiming that they were injured
due to their exposure to CE's asbestos-containing products.

Basic, a subsidiary of CE, has also been sued by numerous persons alleging injury from exposure to asbestos contained in products manufactured or distributed by Basic.

CE and Basic purchased primary and excess liability insurance in the regular course of their business.  For CE, the excess liability policies included one fourth-layer policy purchased from United States Fire Insurance Company ("USFI"), Policy No. XS 2012 ("XS 2012"), and ten higher-level policies from International Insurance Company ("International").  CE purchased XS 2012 in the early 1960s.  The International policies were issued between 1975 and 1985, and had a combined total coverage limit of $67 million.  Basic's policies included two purchased from the North River Insurance Company ("North River") in the 1970s, with a combined total coverage limit of $12 million.  USFI, International and North River were all subsidiaries of Crum & Forster, Inc., a holding company.

CE and Basic first relied on their primary insurers to pay the costs of the asbestos claims filed against them, but eventually the companies exhausted the coverage provided by those insurers.  CE and Basic then turned to their lower-level excess liability carriers, and eventually to their higher-level excess liability policies, to cover the growing costs of defending and resolving the asbestos lawsuits.

4

A.

In November, 1989, CE's third party claims administrator notified USFI that CE's asbestos liabilities had exhausted all of its underlying coverage and that its claims had reached XS 2012. USFI disputed the applicability and extent of its coverage obligations under XS 2012, and the parties entered into negotiations to settle the claims.  XS 2012 was issued for a three-year period from February 1, 1963, to February 1, 1966, and included a policy limit of five million dollars.  Plaintiffs maintain that the policy limit was for the entire policy period and contend that CE claimed that the policy limit was for each year of the policy period, yielding a total of fifteen million dollars in coverage.  (Pl. Br., at 7-8.)  Defendants maintain that there is no evidence to support Plaintiffs' description of the dispute.  (Def. Br., at 10.)

The record indicates that the substance of the negotiations focused on USFI's obligations to CE under XS 2012.  There is no evidence to suggest that other policies issued by USFI, International, North River or other Crum & Forster companies were mentioned or discussed during the negotiations.  No representative of Basic took part in the negotiations, nor does it appear that Basic was ever mentioned or discussed.  In fact, USFI's representative was unaware that Basic was a subsidiary of CE or even existed at all.

5

After almost two years of negotiations, CE and USFI agreed to settle for ten million dollars.  Their agreement was memorialized in a "Settlement Agreement and Release" dated June 18, 1991 ("the Agreement").  The Agreement was signed for CE by Richard M. Burt, Secretary of CE and General Counsel of U.S. ABB, CE's United States corporate parent, and for USFI by Roger Prickett, Vice President of USFI, International and North River. The only signatories to the Agreement are CE and USFI.

The only insurer specifically mentioned by the Agreement is USFI, and the only insured CE.  In the introductory paragraph of the Agreement sets out that Combustion Engineering, Inc., will be referred to as "Combustion Engineering" throughout the document, and United States Fire Insurance will be referred to as "U.S. Fire."[2]  The only policy identified in the Agreement is XS 2012. Basic is not named anywhere within the document, nor are International or North River specifically mentioned.

The provisions of the Agreement defining the key terms, however, give "Combustion Engineering" and "U.S. Fire" meaning broader than their corporate identities.  Paragraphs 1 and 5 of the document, define "Combustion Engineering" and "U.S. Fire" to cover a range of entities and individuals including predecessors and successors in interest, subsidiaries, affiliates, agents,

---

[2]Where the Agreement uses these defined terms, the Court will so indicate by the use of quotation marks.

6

servants, employees, offices, directors and assigns. (Agreement, ¶¶ 1 & 5.)  The defined term "Combustion Engineering" is stated to include "any and all other Persons. . . insured or making claims under the Policy . . . issued to Combustion Engineering." (Agreement ¶ 1.)  The defined term "U.S. Fire" is stated to include "any entity of Crum and Forster Inc. and any related corporate entity." (Agreement, ¶ 5.)

The heart of the Agreement is found in the settlement and release provisions in Paragraphs 16 and 17.  In relevant part, Paragraph 16 obligates USFI to pay CE ten million dollars to settle all past, present and future disputes with respect to "any insurance coverage which may have been issued by U.S. Fire to Combustion Engineering, including Policy No. XS 2012, for all past, present and future claims." (Agreement, ¶ 16.)

Paragraph 17 sets out the release provisions of the Agreement in three subparagraphs.  The first two subparagraphs appear to address the disputed claims for insurance coverage:

    A.    The payment by U.S. Fire set forth in Paragraph
    16 will forever extinguish and discharge U.S. Fire from
    any and all obligations to provide insurance coverage
    under U.S. Fire Policy No. XS 2012, including but not
    limited to loss, costs and expenses with respect to any
    past claims, pending claims or any claims which may
    arise in the future.

    B.    It is expressly agreed and understood by and
    between the parties hereto that any future claims shall
    not be the responsibility of U.S. Fire since this
    Agreement is full, complete and final and said claims
    shall be the sole and complete responsibility of
    Combustion Engineering.

7

(Agreement, ¶ 17(A), (B).)  Paragraph 17(C) releases the insurer from any claims for damages arising from its handling of claims submitted to the insurer, except for punitive damages sought by a party other than CE.  (Agreement, ¶ 17(C).)

The Agreement was apparently successful in settling the dispute between CE and USFI over XS 2012.  The ten million dollar settlement amount was long ago paid by USFI, although the record does not provide an exact date or dates of payment.  CE ceased submitting claims to USFI.  USFI is not a party to this proceeding.

Following the execution of the Agreement, both CE and Basic submitted claims to other insurance companies subsidiaries of Crum & Forster.  Basic began tendering claims to North River in 1992.  The record does not indicate whether North River paid any claims under the two policies issued to Basic, but North River never suggested that the Agreement released it from its insurance obligations until the filing of the adversary complaint.  In 1997, CE notified International that CE's liabilities had reached the ten policies issued to CE by International.  By the fourth quarter of 1999, CE billed International $927,000 under those policies, which International has not yet paid.

B.

Prior to the mid-1990s, approximately two-thirds of CE's asbestos liability was covered by insurance.  By 2002, however,

8

several of CE's insurers took the position that only one-third of
CE's liabilities were reimbursable.  Between 1990 and 2002, CE
received $517,000,000 from its insurers to cover its asbestos
liabilities, while it incurred $950,000,000 in such liability.
Under the weight of these liabilities, CE and its United States
parent company, Asea Brown Boveri, Inc. ("US ABB") began
preparing for CE to file for bankruptcy.

On February 17, 2003, CE filed for bankruptcy through a pre-
packaged Chapter 11 reorganization, in the Bankruptcy Court for
the District of Delaware.  On June 23, 2003, Bankruptcy Judge
Judith Fitzgerald recommended approval of the reorganization plan
with a few changes.  *In re Combustion Engineering, Inc.*, 295 B.R.
459 (Bankr. D. Del. 2003).  In an unpublished oral opinion, Judge
Alfred M. Wolin, sitting by designation in the District of
Delaware, adopted the Bankruptcy Court's findings of fact and
conclusions of law, and confirmed the plan with two changes of
its own.  Appeals were filed by the Certain Cancer Claimants,
First State Insurance Company and a group of CE's primary and
excess liability insurers, including TIG and North River.  On
December 2, 2004, the Third Circuit vacated the district court's
approval of the reorganization plan and remanded the matter for
further proceedings.  *In re Combustion Engineering, Inc.*, 391
F.3d 190 (2004).

9

II.

Plaintiffs brought this adversary proceeding in the Bankruptcy Court, seeking a declaration that any claims for coverage under policies issued by them were released by the Agreement.[3]  Plaintiffs allege that the release provisions found in Paragraph 17 of the Agreement covered all insurance company subsidiaries of Crum and Forster, Inc., then the parent company of International, North River and USFI, and all policies issued by such companies.  Defendants contend that the release provisions covered only a single policy, XS 2012, issued by USFI, and assert that the policies issued by Plaintiffs potentially provide coverage for asbestos claims asserted against Defendants. Plaintiffs and Defendants cross-moved for summary judgment on the issue of the scope of the Agreement.

The Bankruptcy Court granted summary judgment for Defendants in an opinion given on the record at a hearing on July 6, 2004, (July 6, 2004, R. at 3-6, 17-18), and memorialized in an Order

---

[3]This adversary proceeding has been bifurcated into two phases.  The instant appeal addresses only issues arising from the first phase of the proceeding, covering the first two of the four claims in Plaintiffs' Complaint.  In Count I, Plaintiffs seek a declaration that the Agreement covered all claims under any policy issued to CE by any insurer related to United States Fire Insurance Company, including ten policies issued by International.  Count II seeks the same declaration with respect to two policies issued by North River to Basic.  The remaining two claims, seeking determination of the scope of coverage under the policies issued by Plaintiffs, were argued in the alternative should the Court reject Counts I and II of the Complaint.

issued July 20, 2004.  Bankruptcy Judge Judith Fitzgerald held that the language of the Agreement was unambiguous and covered only XS 2012.  The Court concluded that there was no evidence that the Agreement was intended to cover policies issued to Basic or by any of the Crum & Forster subsidiaries other than USFI. Judge Fitzgerald focused on the question of whether the signatory for USFI had the authority to sign the Agreement on behalf of the other Crum & Forster companies, and concluded that he did not. The Court noted that the Agreement included any policies issued by USFI to CE other than XS 2012, were other such policies to exist.

On July 30, 2004, Plaintiffs filed a motion for leave to appeal the Bankruptcy Court's July 20, 2004, Order dismissing Counts I and II of Plaintiff's First Amended Complaint for Declaratory Relief.  A hearing on the motion was held on February 24, 2005, and this Court granted leave to appeal in an opinion set forth on the record and memorialized in an Order of February 28, 2005. (February 24, 2005, R. at 35-42.)  The Court proceeded to hear oral arguments on the merits of Plaintiffs' appeal.


III.

The standard of review applied by a district court when reviewing the ruling of a bankruptcy court is determined by the nature of the issues presented on appeal.  Findings of fact are not to be set aside unless they are "clearly erroneous."  *See*

Fed. R. of Bankr. P. 8013; *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 203 (3d Cir. 1995); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir. 1989). Questions of law are subject to de novo or plenary review. *In re Brown*, 951 F.2d 564, 567 (3d Cir. 1991); *J.P. Fyfe*, 891 F.2d at 69.


IV.

The Court affirms the Bankruptcy Court's grant of summary judgment for the Defendants, albeit on different grounds. The Bankruptcy Court erred in its conclusion that the language of the Agreement unambiguously demonstrates that the only policy released was XS 2012. This Court finds that the language of the Agreement is ambiguous. By looking at the structure of the Agreement, the negotiation history of the parties, and other evidence in the record, however, the Court is able to conclude that the intent of the parties to the Agreement was to release only the insurance obligations of USFI, and any of the other Crum & Forster companies, under XS 2012 alone.


A.

A court's primary objective in interpreting a contract is to derive the objective intent of the parties at the time of the making of the contract. The Third Circuit has held that "[i]n construing a contract, a court's paramount consideration is the

12

intent of the parties." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) (citing *O'Farrell v. Steel City Piping Co.*, 266 Pa. Super. 219, 403 A.2d 1319, 1324 (1979)).[4]  In determining the intent of the parties,

---

[4]The parties have maintained that either Delaware, Connecticut or New Jersey applies to the issues in this case. "Before a choice of law question arises, however, there must actually be a conflict between the potentially applicable bodies of law.  Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994)(citations omitted).

Neither party has identified any relevant differences in the laws of the three states with regard to the interpretation of contracts.  The Court's research has not revealed any relevant differences, save one.  State and federal courts in the Third Circuit adhere to a relaxed version of the traditional "four corners" rule, allowing courts to consider some extrinsic evidence in determining whether a contract's language is ambiguous.  *See Mellon Bank*, 619 F.2d at 1011 (interpreting Pennsylvania law); *Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 182 (3d Cir. 1995)(holding that *Mellon*'s analysis was similar to that which would be performed under New Jersey law); *Kier Constr., Ltd., v. Raytheon Co.*, No. 19526, 2005 WL 628498, *5 (Del. Ch. Mar. 10, 2005)("[W]hen determining the meaning or ambiguity of a contract, the court will consider 'relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties....'").

Connecticut courts have not abandoned the "four corners" approach as a rule of general applicability.  *See, e.g., Levine v. Massey*, 654 A.2d 737, 740-41 (Conn. 1995).  The standard employed by the Connecticut courts, however, is strikingly similar to that applied in New Jersey and Delaware.  As one court put it:

> In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish.... The intention of the parties to a contract is to be determined from the language

the court is concerned with the "objective manifestations of [the parties'] intent." *Id.*

In order to aid it in determining the intent of the parties, the court may allow the parties to offer evidence that sheds light on their objective intent.  The Third Circuit has rejected a strict application of the "four-corners" approach[5] and instead adopted a more comprehensive approach that relies not only upon the language of the contract but evidence offered by the parties. *See Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, 149-50 (3d Cir. 1996).

Under the Third Circuit's approach, before language in a contract is considered ambiguous, the court "hear[s] the proffer of the parties and determines if there are objective indicia that

---

used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.
*O'Bryan v. O'Bryan*, 787 A.2d 15, 18 (Conn. App. 2001)(citing *Barnard v. Barnard*, 570 A.2d 690 (Conn. 1990)).
Given the Court's holding that the language of the Agreement is ambiguous, this slight difference between the laws of the three proposed states is not significant, nor does it affect the outcome in any way.  As such, the Court need not resolve the choice of law issue.

[5]The strict "four-corners" doctrine commands a court to sit in an isolated position and decide if words are "clear" or "ambiguous." *Mellon Bank*, 619 F.2d at 1011; *see also Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, (3d Cir. 1996)(rejecting application of four corners approach in interpreting meaning of contractual language).

from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Mellon Bank*, 619 F.2d at 1011. A contract is not ambiguous simply because both parties disagree over the construction of the terms in the contract. To the contrary, a contract is ambiguous only when the contract (or terms thereof) are susceptible of two different interpretations or more than one meaning. *Id.* In assessing the language of a contract, a court considers the language itself, the alternative interpretations suggested by counsel, and the nature of the extrinsic evidence to be offered in support of each interpretation. *Id.*

While outside evidence is relevant and permissible in determining whether contractual language is ambiguous or clear, terms of the contract should be given their "plain and ordinary meaning."[6] In *American Cyanamid Company*, the Third Circuit held that extrinsic evidence is important only to the extent that such evidence provides "objective indicia that . . . the terms of the contract are susceptible of different meanings." 543 F.3d at 181. However, a court is not required to conclude that contract language is ambiguous before admitting outside evidence that is relevant to a determination of the intent of the parties at the

---

[6]"Plain and ordinary meaning" is a rule of construction where "the common or normal meaning of language will be given to the words of the contract unless the circumstances show that in a particular case a special meaning should be attached to them." Lord, Richard A., *Williston on Contracts*, § 32.3 (4th Ed. 2004).

time of the formation of the contract. *New Valley*, 89 F.3d at
150; *see also* Restatement (Second) of Contracts § 223 cmt. b
(1981) ("There is no requirement that an agreement be ambiguous
before evidence of a course of dealing can be shown....").

Several different types of evidence can be offered in
support of a party's position about the meaning of language in
the contract including: (1) the structure of the contract; (2)
bargaining history of the parties; and (3) the parties' conduct
that reflects their understanding of the contract's meaning. *New
Valley*, 89 F.3d at 150. While the court may consider many types
of evidence, the "strongest external sign of agreement between
contracting parties is the words they use in their written
contract." *Mellon Bank*, 619 F.2d at 1009.

In determining whether the language of the Agreement is
ambiguous, the Court is guided by the principle that it should
avoid interpreting contractual language in such a way as to
render any term of the contract meaningless or superfluous.
*Penske Logistics, Inc., v. KLLM, Inc.*, 285 F. Supp. 2d 468, 474
(D.N.J. 2003) ("Under the principles of contract interpretation,
a contract should not be given an interpretation which renders a
term or terms superfluous or meaningless. . . ."); Restatement
(Second) of Contracts, § 203 ("[A]n interpretation which gives a
reasonable, lawful, and effective meaning to all the terms is
preferred to an interpretation which leaves a part unreasonable,

16

unlawful, or of no effect. . . ."). At all times, however, the intent of the contracting parties is the touchstone for interpreting contractual language.

B.

The main source of ambiguity in the contract language can be found in conflicting language contained in the provisions of the Agreement setting forth the terms of the settlement and release. The release provision in Paragraph 17 specifically states that it is discharging all obligations under XS 2012. The settlement provision in Paragraph 16, however, appears to indicate that it is intended to settle disputes related to any insurance coverage, including XS 2012. This varying language describing the scope of the release is echoed in other provisions of the Agreement.

The payment provision of the Agreement, found in Paragraph 16, specifies that the ten million dollar settlement covers any disputes related to "*any insurance coverage* which may have been issued by U.S. Fire to Combustion Engineering, *including* Policy No. XS 2012." (Agreement, ¶ 16.)(Emphasis added.) This phrase suggest that XS 2012 may not be the only policy being settled in the Agreement. Adopting the broad definitions of "U.S. Fire" and "Combustion Engineering" suggested by Plaintiffs, this provision could indicate that USFI and CE intended to release insurance obligations under policies other than XS 2012, including policies

issued by International and North River to CE and Basic.

At first glance, the ten million dollar figure appears to split the difference between the amount of coverage United States Fire Insurance claimed the policy included (five million dollars) and the fifteen million dollar figure allegedly claimed by CE. The natural logic of this figure suggests that the parties intended to release only United States Fire Insurance's obligations under XS 2012. The settlement amount, however, may not so strongly indicate that only XS 2012 was at issue. The parties may have agreed that United States Fire Insurance was correct in its claim that the policy limit was five million dollars, and the extra five million dollars in payment could have been intended as a settlement for other policies. The parties may have recognized that the other policies issued by companies within the "U.S Fire" umbrella were worth very little money, or at the very least, underestimated their value.

The expansive language of Paragraph 16 is countered by the actual release provisions contained in Paragraph 17, which suggest that the Agreement is narrower in scope. Paragraph 17(A) sets forth that the payment by "U.S. Fire" will "forever extinguish and discharge U.S. Fire from any and all obligations to provide insurance coverage under U.S. Fire Policy No. XS 2012," including past, pending and future claims. (Agreement, ¶ 17(A).) It is clear that this language is intended to release

18

only coverage obligations under XS 2012.  Even if the Court employed the broad definition of "U.S. Fire," at most this provision releases the other Crum & Forster companies from any obligations under XS 2012 alone.

Paragraph 17(B) states that "any future claims shall not be the responsibility of U.S. Fire."  (Agreement, ¶ 17(B).)  The exact meaning of this paragraph is not apparent.  It is clear, however, that it does not expand the release provision contained in Paragraph 17(A) to cover any other policies.  Paragraph 17(B) does not include any reference to insurance coverage or other particular policies.  It would be unusual for parties to employ such general and vague language as in Paragraph 17(B) to accomplish the specific ends that Plaintiffs propose this subparagraph intends, namely to extend the release provision of Paragraph 17(A) to include all policies issued by any company in the Crum & Forster family.

It is also notable that Paragraph 17(B) refers only to "future claims."  Although CE and Basic had not made any demands for payment upon International or North River prior to the signing of the Agreement, CE sent notices of asbestos claims to USFI and International beginning in the 1980s.  These noticed claims would appear to fall somewhere between the specific language of Paragraph 17(A) releasing claims under XS 2012, and the "future claims" Plaintiffs allege are released by Paragraph

19

17(B).  It is hard to believe that the parties would intend to leave out such a class of known, present asbestos claims from the broad release Plaintiffs argue was executed by CE and USFI.

The paragraphs of the Recitals section establish the background context for and the motivations of USFI and CE in executing the Agreement.  The language in this section, however, lends support to both the expansive reading of the Agreement as found in Paragraph 16, and the narrower scope indicated by Paragraph 17(A).  Reading Paragraphs 11, 12, 13 and 14 together, nothing in the language of those provisions suggests that the parties intended the Agreement to cover any policy other than XS 2012.  Paragraph 15 stands in marked contrast to the preceding paragraphs, and supports Plaintiffs' broader reading of the Agreement.

The first provision of the Recitals section, Paragraph 11, states that "Combustion Engineering . . . has presented certain claims and may present claims in the future." (Agreement, ¶ 11.) Paragraph 12 establishes that "Combustion Engineering" has an excess liability insurance policy issued by "U.S. Fire" for a three year period spanning 1963-66, "which policy is more specifically identified and listed above," in reference to Paragraph 3's definition of "policy" as XS 2012.  (Agreement, ¶ 12.)

Paragraph 13 notes that the parties to the Agreement have

20

"identified certain pending disputes regarding the nature and extent of coverage provided under the policy more specifically identified and listed above," again in reference to XS 2012. (Agreement, ¶ 13.)  Paragraph 14 identifies a particular dispute: "Combustion Engineering" alleges that its claims have reached and exhausted its coverage under XS 2012, and "U.S. Fire" disagrees. These first four paragraphs support the conclusion that the parties intended the narrow language of Paragraph 17(A) to define the scope of the release.

Paragraph 15 suggests a much broader scope for the Agreement, paralleling the language of Paragraph 16.  It provides that the parties "wish to resolve fully and finally all past, present and future disputes with respect to the applicability and extent of *any insurance coverage* which may have been issued by U.S Fire to Combustion Engineering for all past, present and future claims." (Agreement, ¶ 15.) (Emphasis added.)

The direct and indirect references to XS 2012 in Paragraphs 12, 13 and 14 suggest that the terms "Combustion Engineering" and "U.S. Fire" were used in their narrow sense in this section of the Agreement, as USFI (and not its affiliates, parents or subsidiaries, etc.) issued the policy to CE (and not to its affiliates, parents or subsidiaries, etc.).  Paragraph 15, however, refers to "any insurance coverage," suggesting that the Agreement may encompass other insurance policies.  Whether this

21

refers to long-forgotten policies issued by United States Fire Insurance to Combustion Engineering, or other policies issued by any company within the "U.S. Fire" umbrella to any company within the "Combustion Engineering" umbrella, the Court cannot conclude based on the language alone.

The parties emphasized the issue of the authority of Mr. Prickett to sign the Agreement on behalf of International and North River in their briefs on appeal and at oral argument before Judge Fitzgerald.  The Bankruptcy Court held that Mr. Prickett did not have the authority to bind the other companies within the 'U.S. Fire" umbrella, stating that there was no evidence to support the Plaintiffs' contentions.[7]  (July 6, 2004, R. at 5-11.) This Court notes that *releasees* ordinarily do not sign release forms, as a pure release does not require from them any promises or performance.  International and North River could be released by a document they did not sign or give authority to another to sign on their behalf.

Putting aside the question of whether Mr. Prickett had the authority to sign on behalf of International and North River, the

_____

[7]Paragraph 26(b) states that the parties represent and warrant "that they have taken all necessary corporate and legal actions to duly approve the making and performance of this Agreement and that no further corporate or other approval is necessary." (Agreement, ¶ 26.)  It would be unusual for an official of one insurance company to be given authority to bind other companies without some type of documentary evidence of the grant.

Court must also determine if he intended to do so.  It is notable
that the full corporate names are used on the signature lines,
and not the defined terms "Combustion Engineering" and "U.S.
Fire."  If one person purports to sign a contract on behalf of
multiple parties, it is customary that the person would list or
otherwise indicate the names of all of the parties on whose
behalf he signed.  It would be unusual for a signatory to rely on
a general definitional provision in a contract as the sole means
of clarifying on which companies' behalf he signs.

     This would still be the case even if the Court accepts
Plaintiffs' argument that the Court should read the full
corporate names as referring back to the definitions in
Paragraphs 1 and 5, and thereby including International and North
River as implicit signatories.  Paragraph 5's definition of "U.S.
Fire" does not specifically mention International or North River,
and it would be a rare situation to have a signatory sign on
behalf of parties whose names appear nowhere in the Agreement.
There are no "objective manifestations" in the text that Mr.
Prickett intended to sign on behalf of International or North
River, even if he had the authority to do so.

     The issue of the signatory's authority and intent
underscores the fact that neither Basic, International nor North
River are mentioned anywhere by name in the Agreement.  No
policies other than XS 2012 are specifically identified.  This

23

silence is countered by the fact that some of the language of the Agreement certainly is broad enough to encompass companies other than CE and USFI, and policies other than XS 2012.

Looking at the Agreement as a whole, it is impossible to reconcile the conflicting provisions of the document and discern the intent of the contracting parties based on the language alone.  The text provides support for both the broad reading proposed by Plaintiffs' and the narrow interpretation maintained by Defendants.  Without other evidence of the parties' intent, "the terms of the contract are susceptible of different meanings" and therefore ambiguous.  *Mellon Bank*, 619 F.2d 1011.

C.

Although the language of the Agreement is ambiguous as to the scope of the release, the bargaining history of the parties, and their conduct reflecting their understanding of the Agreement, assist the Court in resolving the ambiguity.  Looking at the evidence in the record, this Court is convinced that the Agreement unambiguously releases only insurance coverage obligations under XS 2012.

In negotiating the Agreement, there is no indication that the parties contemplated executing a release and settlement encompassing all policies issued to CE and Basic by any company within the Crum & Forster family.  There is no evidence that USFI

24

and CE discussed any policies other than XS 2012 during the
negotiations of the Agreement.  Nor was Basic ever mentioned in
the discussions.

Furthermore, CE and Basic had not begun demanding payment
under their policies with International and North River at the
time the Agreement was negotiated.  CE did not inform
International that its liabilities had reached its policies until
1997, six years after the Agreement was executed.  Basic did not
tender claims to North River until 1992, at which point North
River did not argue that the Agreement released its liability
under the two policies it issued to Basic.  North River did not
raise the Agreement as a defense until this adversarial
proceeding.  The International and North River policies also
provided more remote layers of excess liability coverage than XS
2012, and the underlying coverage had not yet been exhausted.

Other courts have similarly rejected the efforts of insurers
to deny coverage under excess liability policies, based on
unrelated settlement and release agreements, to companies faced
with mounting asbestos-related costs.  In *Travelers Ins. Co. v.
McDermott*, No. 01-3128, 2003 WL 21999354 (E.D. La. Aug. 22,
2003), the Eastern District of Louisiana rejected arguments
identical to those made by Plaintiffs based on two settlement
agreements which were similar in structure to the Agreement here.
The court concluded:

> It simply taxes credulity to accept that a
> sophisticated party like [the insured] would release
> [the insurer] from all of its coverage obligations
> under roughly 77 policies issued over the course of
> decades in such a haphazard manner, without separately
> stated consideration or an express release.

*Id.* at *15. The District Court refused to hold that broad definitional language, such as that found in Paragraphs 1 and 5 here, expanded the scope of the releases at issue, especially in light of the specific identification of policies to be released in other sections of the releases. *Id.* at *13; *see also Lexington Ins. Co. v. Combustion Engineering, Inc.*, 264 A.D.2d 319 (N.Y. App. Div. 1999)(declining to extend the release provision of a 1991 settlement agreement and accompanying materials beyond the policies specifically identified in the documents).


V.

Although not clearly reflected in the language of the Agreement, it is evident that CE and USFI intended to release only coverage obligations under XS 2012. The Court affirms the Bankruptcy Court's grant of summary judgment for Defendants. The Court will issue an appropriate order.


Date: April  21st , 2005

s/ *Joseph E. Irenas*
JOSEPH E. IRENAS
Senior United States District Judge

26